UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
CAROL A. FLYNN,

                                    Plaintiff,

                    - against -

McCABE & MACK LLP; REBECCA BLAHUT, ESQ., in
her individual & corporate capacities; ELLEN L. BAKER,
ESQ., in her individual & corporate capacities; DAVID L.
POSNER, ESQ., in his individual & corporate capacities;
and JOHN DOES 1 through 5, in their individual & corporate
capacities.

                                    Defendants.
----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 15-CV-5776 (CS)

<u>Appearances</u>:

Jimmy M. Santos, Esq.
Law Offices of Jimmy M. Santos, PLLC
Cornwall, New York
*Counsel for Plaintiff*

Paul E. Svensson, Esq.
John J. Walsh, Esq.
Hodges Walsh & Messemer, LLP
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 56.)  For the

reasons set forth below, the motion is GRANTED.

## I.        **BACKGROUND**

        The following facts are taken from the parties' Local Rule 56.1 Statements and

supporting materials, and are undisputed unless otherwise noted.[1]

---

[1]  Plaintiff's Local Rule 56.1 Statement follows, in part, my Individual Practice requiring the non-moving party to
set out the moving party's statement before stating whether the non-moving party admits or disputes.  But Plaintiff's

## A.  Plaintiff's Pertinent Employment and Medical History

From approximately October 1994 to February 20, 2014, Plaintiff Carol Flynn worked as a legal secretary at Defendant McCabe & Mack LLP.  (Doc. 9 ("Compl.") ¶ 15.)  At all relevant times Defendants Rebecca Blahut and Ellen Baker were partners at the firm and were Plaintiff's immediate supervisors, Defendant David Posner was a managing partner of the firm, and Donna Morrissey[2] was the firm's office administrator.

In 2005, Plaintiff underwent treatments for cancer.  (Doc. 70 ("P's 56.1") ¶ 1.)  These treatments caused peripheral neuropathy in her arms, legs, and feet.  (*Id.*)  According to Plaintiff, she has "experienced significant numbness, less sensation, tingliness, no sensation and weakness in [her] legs and feet, which has substantially impaired [her] ability to walk, [her] ability to climb stairs and [her ability to] stand for long periods of time.  (Doc. 64 ("Flynn Aff.") ¶ 5.) [3]  Plaintiff

---

counsel inexplicably excised from the moving party's statement the moving party's citations to the record.  This defeats the purpose of having a single complete statement and required the Court to move back and forth between Plaintiff's and Defendants' statements to determine which portions of the record each side believed were relevant.  Plaintiff's counsel in the future must reproduce the entirety of the moving party's statement.  Further, in numerous instances, the responses to the 56.1 Statement are partially in the first person, suggesting that they were written by Plaintiff herself and carelessly transposed.  Defendants' Local Rule 56.1 Statement is also far from perfect, as it sometimes refers to exhibits that have nothing to do with the stated proposition.

[2] Donna Morrissey was terminated as a defendant at a conference held on June 13, 2017.  (Minute Entry dated June 13, 2017.)

[3] The parties dispute whether Plaintiff's peripheral neuropathy manifested in her legs and feet.  (P's 56.1 ¶ 1.)  Defendants point to medical records indicating that Plaintiff "still gets some neuropathy in her arms," (Doc. 57 ("Svensson Aff.") Ex. G at 9), and that her "[l]egs are fine," (*id.* at 63), as well as Plaintiff's testimony that her neuropathy did not change between 2005 and 2014, (P's 56.1 ¶ 2), to contend that neuropathy only affected Plaintiff's arms.  In support of her contention that her peripheral neuropathy also affected her legs and feet, Plaintiff submitted her own affidavit; an affidavit of her physician, Michael Gerringer; as well as medical records, an e-mail, and a memorandum annexed to the declaration of Plaintiff's counsel.  (*See id.* ¶ 1.)  The Gerringer affidavit and its accompanying documents, however, cannot be considered because the affidavit is unsworn.  *See Flanagan v. W.F. Walsh-Structures, Corp.*, No. 05-CV-0691, 2012 WL 4483867, at *3 (E.D.N.Y. Aug. 23, 2012); *Mungo v. Societe Internationale de Telecommunications Aeronautiques, Ltd.*, No. 05-CV-2037, 2007 WL 316573, at *9 (E.D.N.Y. Jan. 30, 2007).  Although Defendants are correct that Plaintiff's personal testimony without supporting medical testimony is insufficient to establish a *prima facie* case under the ADA, (Doc. 77 ("Ds' Reply") at 8), affixed to the declaration of Plaintiff's counsel are medical records that describe foot numbness and foot pain, as well as difficulty walking and balancing, (*e.g.*, Doc. 66 Ex. 8 at 1, 4; *id.* Ex. 10 at 1).  Although it is not clear that Plaintiff's documented foot and leg issues are attributable to neuropathy, the Court must construe the facts in a light most favorable to Plaintiff as she is the non-moving party.  *See, e.g.*, *Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

openly admits, however, that her neuropathy "'didn't really stop [her] from doing the work'" she was assigned by Defendants.  (P's 56.1 ¶ 19.)  She further drove to work and parked in the office lot and also climbed the stairs every day to get from her work station to the parking lot, sometimes using the handicap rail.  (*Id.* ¶ 20.)

### B. Plaintiff's Pre-Termination Medical Treatments & Requests for Accommodations to Attend Physical Therapy and Yoga

Beginning in at least May 2009, Plaintiff attended multiple appointments with various health care professionals and requested time off from work for, among other things, physical therapy and yoga.  (*See* Svensson Aff. Ex. G; P's 56.1 ¶¶ 29, 34, 38.)   On May 29, 2009, Dr. Gerringer recorded no symptoms of neuropathy[4] and noted that Plaintiff had been going to the gym three to four times per week.  (P's 56.1 ¶ 3; Svensson Aff. Ex. G at 5.)  On November 6, 2009, he noted Plaintiff's worsening muscle weakness and documented that Plaintiff had been going to the gym to lift weights.  (P's 56.1 ¶ 4; Svensson Aff. Ex. G at 9.)  On March 3, 2011, Dr. Gerringer recorded no symptoms of neuropathy and noted that Plaintiff had been participating in cardio classes.  (P's 56.1 ¶ 5; Svensson Aff. Ex. G at 16.)  According to Plaintiff, she went to the gym "to keep [her] legs strong," "improve her balance," and "combat the effects of [her] neuropathy."  (Flynn Aff. ¶ 9.)  On June 8, 2011, Dr. Gerringer documented that Plaintiff's musculoskeletal system was "normal."  (P's 56.1 ¶ 7; Svensson Aff. Ex. G at 22.)

---

[4]  Although Plaintiff's physician did not record any symptoms of neuropathy on May 29, 2009, (P's 56.1 ¶ 3; *see* Svensson Aff. Ex. G at 5-8), Plaintiff avers that the purpose of this visit was to discuss her cholesterol test results, not her neuropathy, (Flynn Aff. ¶ 12).  Likewise, Plaintiff asserts that the absence of reference to any symptoms of neuropathy during other visits, some of which are discussed further below, can be explained because the purpose of these visits was to treat other ailments and did not necessitate discussion of her neuropathy.  (*See, e.g.*, P's 56.1 ¶ 5 (purpose of March 3, 2011 visit was to renew prescriptions for blood pressure and cholesterol, so neuropathy was not discussed); *id.* ¶ 8 (February 14, 2012 examination performed by ear, nose, and throat doctor who only examined ear); *id.* ¶ 11 (reason for September 25, 2012 visit was severe leg cramp from sitting in boat).  Although in summarizing the information contained in Plaintiff's records the Court will focus principally on what the medical records indicate or omit, rather than Plaintiff's explanations of the records or visits, the Court acknowledges that notwithstanding any arguably contradictory information contained in her medical records, Plaintiff maintains that her neuropathy has persisted and her condition did not change between 2005 and 2014.  (P's 56.1 ¶ 2.)

During that visit, Plaintiff reported that she had walked three miles with no foot pain. (P's 56.1 ¶ 7; Svensson Aff. Ex. G. at 20.) Plaintiff avers, however, that she later discovered that she had miscalculated and it was only about one mile, and that her comment about the lack of foot pain was made in connection with her complaint that her toes had turned purple. (P's 56.1 ¶ 7; Flynn Aff. ¶¶ 15-16.)

On February 1 and 9, 2012, Plaintiff saw R. Mihail, M.D., who documented that Plaintiffs' musculoskeletal examinations were normal. (Svensson Aff. Ex. G at 30-33; *see* P's 56.1 ¶ 8.) Plaintiff asserts, however, that Dr. Mihail is an ear, nose, and throat doctor and that he only examined her ear, as she was having problems with her hearing. (P's 56.1 ¶ 8; Flynn Aff. ¶ 17.)

On March 16, 2012, Dr. Gerringer recorded that Plaintiff presented with an ulcer in her right leg and that he was "[n]ot sure what caused it aside from her varicose veins." (Svensson Aff. Ex. G at 34; *see* P's 56.1 ¶ 10.) He also documented that neuropathy was one of Plaintiff's existing problems, that this condition "persist[ed]" and was "stable," and that Plaintiff's neurological evaluation evidenced "decreased sensation." (Svensson Aff. Ex. G at 34, 36; *see* P's 56.1 ¶ 9.)

In August 2012, Baker and Blahut were aware that Plaintiff needed to attend physical therapy. (P's 56.1 ¶¶ 28-29.) On August 6, 2012, Blahut approved Plaintiff's request for a schedule change that would enable Plaintiff to attend physical therapy sessions three days per week for twelve weeks. (*Id.* ¶ 29.) In September 2012, when Plaintiff's and other clerical staff's regular work hours were changed from 8:00 a.m. to 4:00 p.m. to 8:30 a.m. to 4:30 p.m., Defendants accommodated Plaintiff by temporarily keeping her work hours at 8:00 a.m. to 4:00 p.m. to allow her to attend her physical therapy sessions for the duration of her treatment. (*Id.*

¶¶ 30-31; Svensson Aff. Ex. O.)  According to Plaintiff, however, there were several instances in which Blahut generated last minute work for Plaintiff – work that Plaintiff says could have been completed by colleagues and would cause her to be late for appointments or to miss them entirely.  (P's 56.1 ¶ 33; Svensson Aff. Ex. C ("Flynn Dep.") at 66:24-68:15.)

In late October 2013, Plaintiff requested that her work schedule again be adjusted to 8:00 a.m. to 4:00 p.m. so that she could attend a yoga class at a local gym to address issues she was experiencing walking.  (P's 56.1 ¶ 38; Svensson Aff. Ex. Q.)  Evidently Plaintiff's preferred yoga instructor's class had changed to 4:30 p.m., and if she did not attend that class, she would have had to adjust her personal schedule to attend a 7:30 class or, presumably, find a different facility.  (P's 56.1 ¶¶ 40-41.)  Although Plaintiff maintains that her doctors encouraged her to "stay mobile," (Flynn Aff. ¶ 25), she admits that the yoga class was not prescribed by any physician, (P's 56.1 ¶ 43).  Indeed, the medical report concerning Plaintiff's October 10, 2013 visit with Dr. Gerringer contains no indication of any determination that it was medically necessary for Plaintiff to attend a yoga class to address her condition, (Doc. 58 ¶ 12; *see* Svensson Aff. Ex. G at 42-46), and Plaintiff testified that it was a personal request so that she could go to a particular gym that was convenient to the office and reasonably priced, (Flynn Dep. at 75:25-78:19).  She further testified that she did not attend yoga classes on the weekends.  (*Id.* at 159:18-23.)  According to Plaintiff, she told Blahut and Baker that she "probably would not have to leave until 4:15 p.m. if that would help," to which Baker responded something to the effect of, "'[S]o, it's health related?'"  (Flynn Aff. ¶¶ 116, 117.)  Plaintiff admits that she never provided a medical note of necessity for yoga classes, but avers that she was never asked to produce such documentation.  (P's 56.1 ¶ 48; Flynn Aff. ¶ 118.)  Defendants ultimately denied Plaintiff's request.  (P's 56.1 ¶ 46.)  According to Plaintiff, she was informed of the denial in

December 2013.  (*Id.* ¶ 47.)  That same month, Plaintiff requested, and Blahut approved on December 23, an accommodation that enabled Plaintiff to take an early lunch to attend a mid-day physical therapy appointment.  (*Id.* ¶ 34; Svensson Aff. Ex. R.)

### C. Plaintiff's Alleged Inappropriate Interpersonal Conduct and Alleged Requests to Leave Work Early Due to Snow

In January 2006, Plaintiff complained to Morrissey that she believed Morrissey was "attacking [her] every move."  (P's 56.1 ¶ 50; Svensson Aff. Ex. I.)  Confused by Plaintiff's accusation, Morrissey invited Plaintiff to discuss it with her.  (P's 56.1 ¶ 51; Svensson Aff. Ex. I.)  Plaintiff avers that Morrissey informed Plaintiff that Blahut had told Morrissey that Plaintiff had made derogatory comments about Morrissey.  (P's 56.1 ¶¶ 50-51; Flynn Aff. ¶¶ 61-63.)  On February 4, 2009, Plaintiff e-mailed Morrissey and stated that Plaintiff had "accepted the fact that Morrissey did not like her."  (P's 56.1 ¶ 55; *see* Svensson Aff. Ex. J.)

On February 5, 2009, Plaintiff acknowledged receiving the McCabe & Mack LLP handbook.  (P's 56.1 ¶ 52; Svensson Aff. Ex. K at 2.)  The handbook included a rule that it was important to be courteous, friendly, helpful and prompt in dealings with fellow staff members.  (*Id.* ¶ 53; Svensson Aff. Ex. K at 1.)

On November 23, 2009, Morrissey authored a memo concerning personnel issues within the department in which Plaintiff worked.  (Svensson Aff. Ex. L.)  She described "severe tension within the department" that was affecting productivity and morale, and was due to issues with Plaintiff's attitude and her interactions with others.  (*Id.*)  According to Morrissey, Plaintiff "took no responsibility" for some of the "severe tension" and "unrest" within her department.  (*Id.* at 1.)  Defendants contend that Plaintiff was counseled regarding her behavior and was told to be clear in her discussions with staff and attorneys.  (P's 56.1 ¶ 57; Svensson Aff. Ex. L at 2.)

Although Plaintiff admits that she was counseled in November 2009, her account of that

meeting differs from Defendants' version. She asserts that she met with Morrissey, Blahut, and Baker and was told that her complaints regarding a lack of training and the need for help from her supervisor or her co-worker, Vera Donivan, were causing a problem. (Flynn Aff. ¶¶ 40-41.) Plaintiff insists that Donivan would ignore her requests, give abrupt answers, and hide some forms on the computer network. (*Id.* ¶ 44.) She further contends that she informed Morrissey and Blahut of the nature of these interactions (although it is unclear when she did so) and that Blahut told Plaintiff that she understood Plaintiff's concerns because Donivan treated Blahut the same way. (*Id.* ¶¶ 45, 47.) According to Plaintiff, the November 2009 meeting[5] ended when Baker stated that there was a lot of miscommunication, and that after the meeting Blahut gave Plaintiff a hug. (Flynn Aff. ¶¶ 54-55.)

On July 23, 2012, Blahut authored a memo in which she described issues concerning Plaintiff's "interpersonal performance." (Svensson Aff. Ex. M at 2.) The memo discussed how Plaintiff's co-workers "walk[ed] on eggshells around her and express[ed] anxiety in having to deal with her directly." (*Id.*) Indeed, Blahut was of the impression that one co-worker "was afraid to work with [Plaintiff] or speak to her." (*Id.*) Blahut indicated that Plaintiff occasionally confronted one of her co-workers and once pulled a file from that co-worker's hands. (*Id.*) She further recounted a time when Blahut asked Plaintiff to make an appointment with a client, and Plaintiff "responded very rudely, slamming her hands on her desk and loudly objecting to having to go to the lobby to do such a thing," which Blahut characterized as "insubordinate, inappropriate and . . . uncomfortable." (*Id.* at 3.) In concluding, Blahut stated:

> [Plaintiff's] constant negative comments are impeding my work and productivity[,] . . . causing strife in our department, . . . [and] outweighing [Plaintiff's] positive

---

[5] Plaintiff states in her affidavit that the meeting took place on November 9, 2009, (Flynn Aff. ¶¶ 40, 54), while the report concerning the meeting indicates it took place on November 19, 2009, (Svensson Aff. Ex. L at 1). The Court assumes based on each side's descriptions of the meeting that they are one and the same. The exact date of the meeting is not material.

contributions . . . to the department.  This cannot continue and will not be tolerated.
If these issues are not resolved immediately we will be forced to ask [Plaintiff] to
leave the department.  We cannot work as a team without everyone doing so.

(*Id.* at 4.)  According to Defendants, Plaintiff was informed that she would be terminated if her

negative actions continued.  (P's 56.1 ¶ 59.)  Although Defendants assert that Plaintiff was

counseled regarding her interpersonal conduct in July 2012, Plaintiff contends she was only

counseled in November 2009.  (*See id.* ¶¶ 54, 58, 59, 64; Flynn Aff. ¶ 66.)  She further asserts

that she was never insubordinate in her dealings with anyone at the firm.  (Flynn Aff. ¶ 69.)

In February 2014, there were times Plaintiff contends she needed to leave work early

because her neuropathy made it difficult for her to drive in the snow.  (*Id.* ¶¶ 96-102; P's 56.1

¶¶ 65-69.)  "[T]he constant braking required in snowy weather," Plaintiff asserts, made it

difficult for her "to feel or sense the brakes and speed pedal due to [her] neuropathy."  (Flynn

Aff. ¶ 102.)  The parties dispute whether Blahut was aware that Plaintiff's desire to leave early

when there was a snowstorm was due to issues arising from her neuropathy.  (*Compare* Svensson

Aff. Ex. F ("Blahut Dep.") at 95:19-25 (Blahut stating that Plaintiff never told her about this

issue), *with* Flynn Aff. ¶ 102 (Flynn averring that Blahut was aware).)

On February 3, 2014, Plaintiff sent an e-mail to Morrissey and Blahut at 2:22 p.m. to

inform them that she was going to leave work at 4:00 p.m. due to the weather and the road

conditions near her home.  (P's 56.1 ¶ 65; Svensson Aff. Ex. S.)  Although Defendants assert

that Plaintiff did not obtain permission and only provided notice via e-mail, Plaintiff contends

that she discussed leaving early with Morrissey before sending the e-mail and that Morrissey told

Plaintiff that it was standard protocol to send the attorneys an e-mail notifying them that she was

leaving early.  (P's 56.1 ¶ 65.)  According to Plaintiff, no one objected before she left early.  (*Id.*)

The next day Plaintiff received an e-mail from Morrissey concerning a computer problem that

Blahut encountered after Plaintiff left the night before. (Svensson Aff. Ex. T.) Plaintiff contends that she found no problem when she examined Blahut's computer, and then told Morrissey that it was probably user error. (*Id.*; P's 56.1 ¶ 67.) At her deposition, Plaintiff testified that "[i]t was a common problem that every time [she] had to leave early there would be some drama after [she] left." (Flynn Dep. at 176:8-10.) She also admits that she blamed Blahut "for creating the drama." (P's 56.1 ¶ 68.)

On February 6, 2014, it was snowing again, so Plaintiff informed Morrissey that "if the snow ke[pt] up [she was] going to have to try and get out of [work] early." (*Id.* ¶ 69.) Plaintiff argues that the reason she needed to leave early was again due to problems associated with her neuropathy, (*id.*), although she nowhere alleges that Morrissey was aware of any connection between her desire to leave early and her medical condition. Morrissey advised Plaintiff that she was entitled to use her personal time when necessary to leave work, but she was required to inform Blahut. (*Id.* ¶ 70.) Plaintiff then complained about Blahut having issues with Plaintiff and others leaving early, and made accusations to Morrissey about Blahut creating a hostile work environment. (*Id.* ¶ 71.) Although Plaintiff does not believe she uttered the phrase "hostile work environment," (Flynn Aff. ¶ 104), she testified that "[she] did describe a hostile work environment" in which Blahut "ma[de] everyone fearful" by way of "intimidation," (Flynn Dep. at 182:13-17, 184:6-11). Defendants assert that Plaintiff further "sought out other employees to join her in her attitude and complaint that Blahut used 'intimidation,'" which Plaintiff disputes, stating that Donivan, who was also present for the conversation, merely nodded her head throughout the conversation. (P's 56.1 ¶ 72; Flynn Dep. at 182:18-21.) That said, when asked during her deposition whether she attempted to get Donivan to agree with her that there was a hostile work environment at the firm at the time, Plaintiff responded that she said to Donivan,

"'Am I not right that [Blahut] creates a problem every time somebody needs to take time?,'" to which Plaintiff said Donivan replied, "'Yes, she could be very nasty.'"  (Flynn Dep. at 182:22-183:4.)

Defendants assert that, after this conversation, Plaintiff cleared out her desk in the belief that she would be fired because Blahut was unhappy about Plaintiff's complaint and Plaintiff learned that Baker was investigating a solution.  (P's 56.1 ¶ 73.)  Plaintiff contends that she did not clear out her desk on February 6 immediately after the conversation – although it is not clear that Defendants so contend – because she did not believe that she was going to be discharged as a result of the statements she made to Morrissey.  (*Id.*)  Instead, Plaintiff asserts that she observed Baker meeting with staff several days later, that at least one staff member informed Plaintiff that the meetings concerned her, that she subsequently asked Morrissey if she was going to be fired, and that Morrissey informed her that she thought Plaintiff would be discharged.  (*Id.*)  It was then, Plaintiff contends, that she started to pack her belongings.  (*Id.*)

### D.    Plaintiff's Termination

Plaintiff was discharged on February 20, 2014.  (*Id.* ¶ 74; Compl. ¶ 15.)  When asked during her deposition about her termination, Plaintiff affirmed that she believed she was discharged for making derogatory statements about Blahut.  (Flynn. Dep. at 198:2-22; *id.* Ex. V.)[6]

### E.    Procedural History

Plaintiff received a Notice of Right to Sue on April 23, 2015, and initiated this lawsuit on

---

[6]  In her response to Defendants' Rule 56.1 Statement, Plaintiff asserts that the New York State Department of Labor's "Statement of Summary" in which she is reported to have said that she was discharged because she made derogatory statements about Blahut, (*see* Svensson Aff. Ex. V), did not contain her actual words and that she was not afforded sufficient time to explain.  (P's 56.1 ¶ 75.)  But at her deposition she affirmed that "[she] believe[d] that that was the case" and that "[it] was [her] belief which turned out to be true."  (Flynn Dep. at 198:20-22.)  Her response to Defendants' Rule 56.1 Statement does not dispute that she so testified.

July 22, 2015.  (Doc. 1; *id.* Ex. A.)  She brings six causes of action, including:

1. Failure to accommodate in violation of the Americans with Disabilities Act ("ADA") against McCabe & Mack LLP,

2. Failure to accommodate in violation of the N.Y. Executive Law § 296 ("NYSHRL") against all Defendants,

3. Unlawful termination on account of her disability, a record of having a disability, and/or being "regarded as" having a disability in violation of the ADA against McCabe & Mack LLP,

4. Unlawful termination on account of her disability, a record of having a disability, and/or being "regarded as" having a disability in violation of NYSHRL against all Defendants,

5. Unlawful retaliation for Plaintiff's complaint and/or opposition to unlawful disability discrimination by terminating Plaintiff's employment in violation of the ADA against McCabe & Mack LLP,[7] and

6. Unlawful retaliation based on the termination of Plaintiff's employment in violation of NYSHRL against all Defendants.

(Compl. ¶¶ 43-54.)  Defendants answered on March 8, 2016.  (Doc. 28.)  After discovery, Defendants filed a letter on May 18, 2017, requesting a pre-motion conference.  (Doc. 53.) Plaintiff responded on June 6, 2017, (Doc. 55), and the parties appeared for a conference to discuss the instant motion on June 13, 2017, (Minute Entry dated June 13, 2017).  Defendants moved for summary judgment on July 12, 2017.  (Doc. 56.)  After being granted two extensions to file a response, (Docs. 61, 63), Plaintiff filed two affidavits and counsel's declaration in opposition to Defendants' motion on August 19, 2017, (Docs. 64-66), the day after the second extended deadline, (*see* Doc. 63).  On August 21, 2017, Plaintiff submitted a third letter requesting an extension of time to serve her opposition brief and her response to Defendants'

---

[7]  It is not entirely clear whether this claim is against all Defendants or just McCabe & Mack LLP.  Plaintiff's heading for this cause of action refers to "Defendants," (Compl. at 11), while Paragraph 52 of the Complaint, which concerns this cause of action, refers only to the firm.  In any event, individuals cannot be liable for retaliation under the ADA.  *See Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010) (per curiam); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 343 (E.D.N.Y. 2014).

Local Rule 56.1 Statement. (Doc. 68.) That same day, prior to any ruling on Plaintiff's request for an extension, Plaintiff filed her response to Defendants' Local Rule 56.1 Statement, (Doc. 70), and her opposition brief, (Doc. 72 (stricken document)). On August 23, 2017, Defendants filed a letter recounting Plaintiff's counsel's history of failing to heed the Court's directions and encouraging the Court not to permit Plaintiff's late filing. (Doc. 74.) Later that day, Plaintiff responded to Defendants' letter, arguing that the Court should excuse the late filing of Plaintiff's papers. (Doc. 75.) On August 29, 2017, in the interests of deciding the case on the merits, the Court struck a compromise by deciding to consider Plaintiff's affidavits, declaration, and Local Rule 56.1 Statement but to strike Plaintiff's opposition brief. (Doc. 76.) On August 30, 2017, Defendants submitted a reply brief in support of their motion, (Doc. 77), and Plaintiff filed a letter requesting that the Court grant Plaintiff leave to file a surreply or, in the alternative, that the Court strike Defendants' reply brief as moot in light of the Court's order striking Plaintiff's opposition brief, (Doc. 78). The Court denied Plaintiff's request on August 31, 2017, explaining that Defendants were entitled to respond to issues raised by the factual material accepted in opposition. (Doc. 79.)[8]

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims, arguing, among other things, that (1) Plaintiff is not a qualified individual with a disability, (2) Plaintiff cannot establish employment discrimination, (3) Defendants articulated a non-discriminatory basis for the termination, (4) Plaintiff cannot show that that reason was a pretext, (5) Defendants did not fail to provide a reasonable ADA accommodation, (6) Plaintiff has not

---

[8] On December 22, 2017, Plaintiff filed a request for oral argument, contending that there are numerous and complex issues of fact that warrant the denial of Defendants' motion for summary judgment. (Doc. 80.) Defendants responded by letter dated December 27, 2017, opposing Plaintiff's request for oral argument on the basis that it was an attempt by Plaintiff's counsel to submit orally what the Court precluded Plaintiff from submitting on paper. (Doc. 81.) The Court finds oral argument to be unnecessary. Thus, Plaintiff's request is denied. Further, Plaintiff's counsel is directed to provide a copy of this Opinion and Order to Plaintiff.

shown that she was discharged in retaliation, and (7) the NYSHRL claims, if the Court accepts jurisdiction over such claims, must be dismissed on similar grounds. (*See* Doc. 59 ("Ds' Mem.").)

## II.   <u>LEGAL STANDARDS</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Id.* 56(e)(2), (3).

## III.  DISCUSSION

The ADA aims to prevent discrimination "against a qualified individual on the basis of disability in regard to," among other things, "privileges of employment" and "discharge" from employment. 42 U.S.C. § 12112(a). Claims under the ADA are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009); *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). "A plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [decision(s)]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (emphasis added).

### A.  Failure to Accommodate under the ADA

"[A] plaintiff makes out a *prima facie* case of . . . failure to accommodate by showing each of the following:  (1) plaintiff is a person with a disability under the meaning of the ADA;

(2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride*, 583 F.3d at 96-97 (alteration and internal quotation marks omitted). Defendants contend that Plaintiff's failure-to-accommodate claim must be dismissed because she cannot establish the first, second, or third elements. (Ds' Mem. at 14-16.)

Although it is far from clear, the Court assumes, without deciding, that Plaintiff had a disability within the meaning of the ADA.

Turning to the second element, which concerns notice, "[a]n employee must . . . tell [her] employer about her disability before her employer has any obligation to accommodate the disability." *MacEntee v. IBM (Int'l Bus. Machines)*, 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011) (internal quotation marks omitted), *aff'd*, 471 F. App'x 49 (2d Cir. 2012) (summary order). "It is also the employee's responsibility to demonstrate to an employer that she needs an accommodation for reasons related to a medical condition disability." *Id.* General awareness that a plaintiff suffered from certain medical conditions is insufficient. *See id.* at 443-44. In *MacEntee*, for example, this Court dismissed a failure-to-accommodate claim where the plaintiff "fail[ed] to provide medical documentation" or "notify her supervisor of her unknowable limitations" because she gave her employer "no notice of her disability and . . . [no] opportunity to offer, or refuse, . . . reasonable accommodations." *Id.* at 444.

Plaintiff alleges that the denial of her request to modify her work hours so that she could participate in yoga and other exercise classes at her gym violated her rights under the ADA. (*See* Compl. ¶¶ 26-29, 43-44.) Defendants argue that Plaintiff cannot sustain her burden to show that Defendants had notice of her need for an accommodation because she failed to present

15

documentation that the yoga class was medically necessary, which Defendants assert Plaintiff was obligated to present. (Ds' Mem. at 14; Ds' Reply at 10.)

The Code of Federal Regulations provides:

> In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed. When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.

29 C.F.R. pt. 1630, app. § 1630.9; *see Ynoa v. N.Y.-Presbyterian*, No. 03-CV-3721, 2005 WL 1653837, at *5 (S.D.N.Y. July 14, 2005), *aff'd sub nom. Ynoa v. N.Y.-Presbyterian Univ. Hosps. of Columbia & Cornell*, 215 F. App'x 47 (2d Cir. 2007) (summary order). Neither the Code of Federal Regulations nor the cases upon which Defendants rely supports Defendants' contention that a plaintiff must provide medical documentation to obtain an accommodation or to meet her burden to prove notice. Although employers in some circumstances are permitted to require such documentation, and may deny the accommodation if it is not forthcoming, the parties seem to dispute whether Plaintiff was so instructed in this case. (*See* P's 56.1 ¶ 48.) At the very least, a rational trier of fact could conclude that Defendants were on notice of Plaintiff's disability because she received approval to go to physical therapy beginning in August 2012, (*id.* ¶ 29; Svensson Aff. Ex. N.), and the memo in Plaintiff's personnel file concerning her October 2013 request regarding yoga class indicates that she "asked [Baker] and [Blahut] if she could change her work hours . . . so she may go back to the gym *because of issues she is experiencing walking*," (Svensson Aff. Ex. Q) (emphasis added). Accordingly, summary judgment based on an absence of notice is not warranted.

As to the third element, Defendants argue (albeit without citing any authority) that Plaintiff cannot establish that the requested accommodation – to leave early from work to attend

a yoga class – was necessary to perform the essential functions of her job. (Ds' Mem. at 15.) Courts have granted summary judgment in defendants' favor in cases where the requested accommodation did not enable the employee to perform the essential functions of the job. *See Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 139 (E.D.N.Y. 2015) (granting summary judgment against employee who "acknowledged under oath that he was performing all the essential functions of the job . . . without any accommodation," such that no "rational factfinder could conclude that plaintiff needed a reasonable accommodation"); *Johnson v. Maynard*, No. 01-CV-7393, 2003 WL 548754, at *6 (S.D.N.Y Feb. 25, 2003) (granting summary judgment in employer's favor in part because employee "testified that she did not need an accommodation while she was working"); *Schultz v. Alticor/Amway Corp.*, 177 F. Supp. 2d 674, 678-79 (W.D. Mich. 2001) (hearing-impaired employee could not show failure to accommodate where employer did not permit him to bring service dog to work where employee acknowledged that essential functions of job did not require assistance of his dog), *aff'd*, 43 F. App'x 797 (6th Cir. 2002) (unpublished order). According to regulations promulgated under the ADA, "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that *enable* an individual with a disability who is qualified *to perform the essential functions* of that position." 29 C.F.R. § 1630.2(o)(1)(ii) (2012) (emphasis added).[9] Here, Plaintiff admits that her neuropathy "didn't really stop [her] from doing [her] work." (P's 56.1 ¶ 19 (internal quotation marks omitted).) When asked whether she told anyone that she was having trouble

---

[9] The regulations also define "reasonable accommodation" to mean "[m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires" or "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(i), (iii) (2012). Neither provision is applicable here.

completing her work due to her neuropathy, she responded, "Well, it didn't really stop me from doing the work. I might have slowed up a little bit but I could get it done." (Flynn Dep. at 158:11-19.) She further testified that her neuropathy "didn't interfere too much with [her] job because [she] had a very sedentary job." (*Id.* at 209:23-210:5.) Because Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that her requested accommodation was necessary to performing the essential functions of her job, Defendants are entitled to summary judgment on Plaintiff's failure-to-accommodate claim based on the denial of her request to leave early to attend yoga classes.

Further, Plaintiff presents no evidence that would render it reasonable for Defendant to modify her schedule. She admits that the particular yoga class she wished to attend was not needed to ameliorate her disability and that what her doctors recommended was that she be active generally. (*See, e.g.*, P's 56.1 ¶ 43; Flynn Aff. ¶¶ 24-25; Flynn Dep. at 75:25-79:9.) While other gyms, other classes or other forms of exercise may have been less convenient, an employer need not modify its job requirements for the convenience of its employees.[10] Plaintiff's "shift change request appears to be no more than a personal preference . . . and the ADA imposes no obligation on employers to accommodate personal preferences." *Bresloff-Hernandez v. Horn*, No. 05-CV-384, 2007 WL 2789500, at *10 (S.D.N.Y. Sept. 25, 2007).

To the extent Plaintiff's failure-to-accommodate claim encompasses Blahut's alleged displeasure with Plaintiff leaving work early due to snow, allegedly due to difficulty driving because of her disability, (*see* Flynn Aff. ¶¶ 96-102), the claim is without merit. First, Plaintiff does not allege that Defendants refused her requests to leave early due to snow. To the contrary,

---

[10] Plaintiff faults Defendant for not allowing her out of work early to exercise, yet she herself declined to exercise on the weekends because doing so would conflict with her personal plans. (P's 56.1 ¶¶ 41-42; Flynn Dep. at 159-60 (explaining that she did not do yoga on weekends because class might not coincide with her other plans during the day)).

she asserts that no one objected when she notified her colleagues on February 3, 2014, that she needed to leave early due to the weather conditions that day, (*id.* ¶¶ 96-97), and does not identify any objection to the similar request that she made three days later, (*id.* ¶¶ 100-02). Second, Plaintiff identifies no repercussions associated with her leaving early. Morrissey sent her an email at 4:19 p.m. on February 3, 2014 regarding a computer problem that Blahut was having, (Svensson Aff. Ex. T), which Plaintiff did not receive until the next morning because she had already left, (P's 56.1 ¶ 66; *see* Svensson Aff. Ex. T). She attended to the problem at that time. (Flynn Aff. ¶ 98; Svensson Aff. Ex. T.) Plaintiff characterizes this series of events as Blahut creating "drama," (P's 56.1 ¶¶ 67-68; Flynn Aff. ¶ 99), but that is simply not a reasonable characterization of the events, let alone one that rises to the level of a failure to accommodate.[11]

Accordingly, Defendants' motion for summary judgment on Plaintiff's failure-to-accommodate claim under the ADA is granted.

## B. ADA Discrimination Claim

To establish a *prima facie* case of discrimination based on disability, a plaintiff must

---

[11] If Plaintiff means to allege that Morrissey advising Plaintiff to use personal time when she left early on snowy days was a refusal to accommodate, such a claim also fails. First, she provides no evidence that Morrissey connected Plaintiff's requests to leave early with her neuropathy. She alleges (in wholly conclusory fashion) that Blahut and Baker knew that such requests related to Plaintiff's braking difficulties in snow, (Flynn Aff. ¶ 99), but makes no such allegation as to Morrissey. Indeed, Plaintiff's February 3, 2014 email to Morrissey and Blahut with the subject line "Unless the weather improves . . ." states "I am going to leave at 4:00 PM to avoid rush hour. I live in a high elevation area notorious for bad roads." (Svensson Aff. Ex. S.) Second, the ADA does not require employers to pay employees for time they are absent from work. *See Criado v. IBM Corp.*, 145 F.3d 437, 444 n.2 (1st Cir. 1998) ("[T]he legislative history of the ADA indicates that Congress did not intend for an individual with a disability to be entitled to more paid leave time than non-disabled employees.") (internal quotation marks omitted); *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 597 (S.D.N.Y. 2002) (employer not required to provide employee with paid leave); 29 C.F.R. pt. 32, app. A, Accommodations for Participants and Employees subsection (b) (Department of Labor regulation that reasonable accommodation may require an employer "to grant liberal time off or leave without pay when paid sick leave is exhausted and when the disability is of a nature that it is likely to respond to treatment of hospitalization"); 29 C.F.R. pt. 1630, app. § 1630.2(o) (EEOC interpretive guidance on ADA stating that reasonable accommodation "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment").

show: "'(1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered [an] adverse employment action because of h[er] disability.'" *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (sixth alteration in original) (quoting *Giordano v. City of N.Y.*, 274 F.3d 740, 747 (2d Cir. 2001)).

To carry her burden on the fourth element of the *prima facie* case, Plaintiff "has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that her discharge occurred under circumstances giving rise to an inference of discrimination." *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 885 (N.D.N.Y. 1996). "Needless to say, the facts that [P]laintiff is disabled and that [McCabe & Mack LLP] fired her is insufficient to raise [a]n inference of discrimination." *Id.*; *see Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("[Plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his [protected status].") (alterations and internal quotation marks omitted); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (internal quotation marks omitted), *aff'd*, 693 F. App'x 41 (2d Cir. 2017) (summary order).

Plaintiff here has shown no more. She points to no connection between her disability and her termination. To the contrary, she concedes that her complaints about Blahut's alleged nastiness are what led to her termination. (Flynn Dep. at 198:1-22; *see* P's 56.1 ¶¶ 71-72.) It is

hardly surprising – and not evidence of discrimination – that when a staff member in a law firm has conflicts with a partner, the staff member is the one to go.

Assuming for the sake of argument that Plaintiff has made out a *prima facie* case, Defendants have offered ample evidence that they terminated Plaintiff for her poor interpersonal skills and insubordination. Defendants have provided an excerpt from the McCabe & Mack LLP handbook indicating that it is "important for staff members to be courteous, friendly, helpful and prompt in dealing with one another," (P's 56.1 ¶ 53 (citing Svensson Aff. Ex. K)); an e-mail from Plaintiff to Morrissey dated January 31, 2006, in which Plaintiff complained that Morrissey was "'attacking [her] every move,'" (*id.* ¶ 50 (quoting Svensson Aff. Ex. I)); and an e-mail from Plaintiff to Morrissey dated February 4, 2009, in which Plaintiff stated that she "had accepted the fact that [Morrissey] d[idn't] like [her]," (Svensson Aff. Ex. J). Defendants have also offered a memo from Morrissey dated November 23, 2009, indicating that Plaintiff's "work product [was] excellent" but that "her attitude . . . is [an] issue" and that Plaintiff "took no responsibility" for some of the "severe tension" and "unrest" within her department. (*Id.* Ex. L at 1.) Plaintiff admits that in 2009 she claimed that Blahut was "aggravating" and "divisive," and "tr[ied] to cause drama." (P's 56.1 ¶¶ 60-61 (internal quotation marks omitted).)

Defendants further provide a memo from Blahut dated July 23, 2012, describing issues concerning Plaintiff's "interpersonal performance." (Svensson Aff. Ex. M at 2.) The memo discusses how Plaintiff's co-workers "walk[ed] on eggshells around her and express[ed] anxiety in having to deal with her directly" and described how Plaintiff "from time to time confront[ed]" a particular co-worker, "often for long periods of time in a closed door meeting," and also "physically pulled [a] file out of [that co-worker]'s hands," all of which Blahut stated she was "not pleased with." (*Id.*) Blahut also noted that Plaintiff and another co-worker did not get

along, and Blahut was of the impression that that co-worker "was afraid to work with [Plaintiff] or speak to her." (*Id.*) Blahut further recounted a time when she asked Plaintiff to make an appointment with a client, and Plaintiff "responded very rudely, slamming her hands on her desk and loudly objecting to having to go to the lobby to do such a thing," which Blahut characterized as "insubordinate, inappropriate and . . . uncomfortable." (*Id.* at 3.) In concluding, Blahut stated:

> [Plaintiff's] constant negative comments are impeding my work and productivity[,] . . . causing strife in our department, . . . [and] outweighing [Plaintiff's] positive contributions . . . to the department. This cannot continue and will not be tolerated. If these issues are not resolved immediately we will be force to ask [Plaintiff] to leave the department. We cannot work as a team without everyone doing so.

(*Id.* at 4.)

This documentation all preceded Blahut granting Plaintiff's requested schedule change so that she could attend physical therapy. (*See* P's 56.1 ¶ 29.) Relations between Plaintiff and Blahut apparently warmed thereafter, as Blahut gave Plaintiff an excellent performance review in June 2013, in which she noted, among other things, that "[t]here were some bumps in the road last July/August with inter-department workings, but I believe these issues are long behind us and hope the road head [*sic*] stays as smooth as it has been." (Svensson Decl. Ex. P.)

The road ahead did not, however, remain smooth. Plaintiff admits that in 2014 she again "blamed Ms. Blahut for creating . . . drama[,] . . . just as she had in 2009," (P's 56.1 ¶ 68), and complained to co-workers that Blahut's actions effectively created a hostile work environment, although Plaintiff maintains that she never used the term "hostile work environment," (*id.* ¶ 71 (internal quotation marks omitted)). Defendants provide a memo to file concerning Plaintiff's termination dated February 20, 2014, which summarized Plaintiff's complaints, noted that Plaintiff "continued to bring unwanted turbulence . . . [for] four years," expressed the sentiment

that "[t]here is nothing further that [could be done] to make it work," and requested that Plaintiff

be removed from the department.  (Svensson Aff. Ex. U.)

Employee insubordination and other conduct that is disruptive to the workplace are

legitimate, nondiscriminatory reasons for terminating an employee.  *Tebbenhoff v. Elec. Data

Sys. Corp.*, 244 F. App'x 382, 384 (2d Cir. 2007) (summary order); *McCowan v. HSBC Bank

USA, N.A.*, 689 F. Supp. 2d 390, 409 (E.D.N.Y. 2010); *see Matima v. Celli*, 228 F.3d 68, 79 (2d

Cir. 2000).  An employer can take adverse employment action against an employee "to preserve

a workplace environment that is governed by rules, subject to a chain of command, free of

commotion, and conducive to the work of the enterprise."  *Matima*, 228 F.3d at 79.

"[I]t matters not if Plaintiff [was] not [insubordinate or disruptive], as [s]he insists."

*Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 933 F. Supp. 2d 534, 550 (S.D.N.Y. 2013),

*aff'd*, 748 F.3d 471 (2d Cir. 2014).  "Rather, what does matter is that Defendant has offered

evidence that [the employer] had a good faith basis for *believing* that Plaintiff" was causing

trouble.  *Id.* (emphasis in original).

Because Defendants have met their burden to offer a legitimate, non-discriminatory

reason for terminating Plaintiff, the burden shifts to Plaintiff to produce evidence that

Defendants' reason is a pretext.  *Sista*, 445 F.3d at 169.  A plaintiff "must produce not simply

some evidence, but sufficient evidence to support a rational finding that the legitimate, non-

discriminatory reasons proffered by the defendant[s] were false, and that more likely than not

discrimination was the real reason for the employment action."  *Weinstock v. Columbia Univ.*,

224 F.3d 33, 42 (2d Cir. 2000) (alterations, internal quotations marks, and citation omitted),

*superseded by statute on other grounds as stated in Ochei v. Coler/Goldwater Mem'l Hosp.*, 450

F. Supp. 2d 275, 282-83 (S.D.N.Y. 2006).  "In short, the question becomes whether the evidence,

taken as a whole, supports a sufficient rational inference of discrimination." *Id.*

Plaintiff has produced positive performance appraisals from the spring of each year from 2006 to 2009, (Santos Decl. Exs. 11-16), copies of appreciation cards and references from her co-workers, (*id.* Ex. 17), and e-mails that are generally positive about Plaintiff's work performance, (*see id.* Exs. 21-22), including Blahut's positive 2013 review. Plaintiff has also offered an e-mail from Donivan to Plaintiff dated May 28, 2014, in which Donivan stated that she signed "under protest" a statement concerning Flynn's comments regarding Blahut creating a hostile work environment, (*id.* Ex. 30; *see id.* Ex. 29), as well as Plaintiff's own account of the months leading up to her termination, (*see, e.g.*, Flynn Aff. ¶¶ 91-112).[12]

Plaintiff's evidence, however, is insufficient to support a rational finding that Defendants' proffered reasons were false and that more likely than not discrimination on the basis of disability was the real reason for the employment action. *See Weinstock*, 224 F.3d at 42. Plaintiff has not presented any statements reflective of bias against those with disabilities or pointed to conduct that would reasonably lead a trier of fact to conclude that Defendants more likely than not harbored a discriminatory motive when firing Plaintiff. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 744 (2d Cir. 2014) (summary order).

---

[12] Plaintiff also provided declarations from two former McCabe & Mack LLP employees, Harold L. Mangold and Thomas D. Mahar, Jr., who aver that they were told that on April 18, 2017, Blahut indicated that she previously had attended a lunch with Mangold and Mahar during which they stated that Plaintiff "had a problem with her co-workers." (Santos Decl. Exs. 5-6.) Both declarants affirm that they do not recall the lunch and never made such a statement. (*Id.*) Although it is not clear, it seems likely that the declarants are referring to statements that Blahut allegedly made during her April 17, 2017 deposition, given the temporal proximity of the dates and the absence of other evidence indicating that Blahut provided any pertinent statements on April 18, 2017. Blahut's deposition testimony, however, contains no reference to any lunch with Mangold or Mahar during which she claims they stated that Plaintiff had a problem with her co-workers. To the contrary, Blahut testified that she could not recall a time when Mangold indicated that Plaintiff was not getting along with her co-workers, (Blahut Dep. at 35:13-37:10), and that Mahar never complained about Plaintiff prior to her termination, but told Blahut that he "was not surprised" about Plaintiff's termination because "[Plaintiff] was always prickly and difficult," (*id.* at 63:4-12). Further, Blahut's only reference to a lunch with Mangold and Mahar was in the context of describing an occasion where Mangold may have attended a lunch with Mahar and Plaintiff. (*Id.* at 61:23-62:12.) Thus it appears that someone associated with Plaintiff provided these declarants with inaccurate information. In any event, these declarations do not support a rational finding that Defendants' stated reasons for firing Plaintiff were a pretext for discrimination.

Instead, Plaintiff disputes the facts underlying her November 2009 meeting with Morrissey, Blahut, and Baker and asserts that she was never counseled in July 2012, (*see, e.g.*, P's 56.1 ¶¶ 54, 56-59), and points to evidence that she was a good employee. But "[i]n a discrimination case . . . [the Court is] decidedly not interested in the truth of the allegations against [P]laintiff." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Rather, the Court is "interested in what '*motivated* the employer . . .'; the factual validity of the underlying imputation against the employee is not at issue." *Id.* (emphasis in original) (citation omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *see Eisner v. Cardozo*, 684 F. App'x 29, 31 (2d Cir. 2017) (summary order) (relying on *McPherson* rule in ADA employment discrimination context). And Plaintiff has made no showing that the reports that document what her employer perceived to be her insubordination and poor interpersonal skills are false or otherwise generated to mask illegal discrimination. *See McPherson*, 457 F.3d at 216 n.7; *see also Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (explaining that because "[e]vidence that [defendant] made a poor business judgment in [its adverse employment decision] generally is insufficient to establish a genuine issue of fact as to the credibility of the [defendant's] reasons . . . [,] the reasons tendered need not be well-advised, but merely truthful"); *Duckett v. Wal–Mart Stores, Inc.*, No. 07-CV-6204, 2009 WL 995614, at *11–12 (W.D.N.Y. Apr. 14, 2009) (noting that "when analyzing a pretext claim the inquiry is whether the employer's stated reason is the actual reason for the challenged action and not whether the employer's stated reason for its decision is ill-advised, mistaken, or unreasonable," and granting summary judgment where defendant claimed that it terminated plaintiff due to her unauthorized use of a discount, a claim plaintiff disputed).

Plaintiff goes to great lengths to cast Blahut as the difficult one in the relationship. But

even assuming that to be true, it does nothing to undermine the conceded facts that she and Blahut did not get along and that she badmouthed Blahut to Morrissey and Donivan shortly before she was fired. And it does even less to suggest that Plaintiff's disability had anything to do with her being fired. In other words, Plaintiff may dispute whether she was in fact a troublemaker, but her evidence does not dispute that the firm *thought* she was a troublemaker. "In short, although [Plaintiff] may consider [D]efendant's termination decision an over-reaction to her perceived mishaps, she can point to no evidence in the record indicating that her employer was not, in fact, displeased with her actions, much less that the real reason for her termination was [disability] discrimination." *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) (summary order); *see Henkin v. Forest Labs., Inc.*, No. 01-CV-4255, 2003 WL 749236, at *6 (S.D.N.Y. Mar. 5, 2003) ("[A]n employee's disagreement with her employer's perception of her work does not satisfy her burden of showing that the employer's proffered reason for termination was a pretext for discrimination."), *aff'd*, 88 F. App'x 478 (2d Cir. 2004) (summary order).

Further, Plaintiff's argument that the claim that she was a troublemaker is false does not suffice to defeat summary judgment because "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (internal quotation marks omitted). There is simply nothing in this record to suggest that Plaintiff's medical condition, rather than the employer's perception of her workplace conduct, motivated her dismissal. While direct evidence of discriminatory intent is not required, and "credible evidence that a defendant's explanation is false along with a strong *prima facie* case may support an inference that the adverse action was motivated by discrimination," *Widomski*,

933 F. Supp. 2d at 551 (emphasis added), here there is neither a strong *prima facie* case, nor credible evidence that the employer's explanation was not held in good faith, nor any direct evidence. And "Plaintiff's subjective belief that [s]he was not treated fairly is simply not enough to demonstrate pretext." *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007).

Accordingly, Defendants' motion for summary judgment on Plaintiff's ADA discrimination claim is granted.

## C. ADA Retaliation Claim

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) [she] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia*, 313 F.3d at 719. Plaintiff asserts that she was terminated, "in whole or substantial part, in retaliation for [her] prior requests for reasonable accommodation for her peripheral neuropathy condition, and for her complaint and opposition to [D]efendants' failure to grant her reasonable accommodation and [D]efendants' unlawful disability discrimination." (Compl. ¶ 52.) Plaintiff requested (and was granted) an accommodation in August 2012, and she arguably requested an accommodation in October 2013 which was denied in December 2013. Plaintiff protested that denial by telling Morrissey that she was "shocked" or "kind of surprised" because other people were allowed to leave early to go to school or pick up their children. (Flynn Dep. 87:21-22; 88:15-21 (internal quotation marks omitted).) The temporal proximity between December 2013 and her termination in February 2014 suffices to raise an inference of retaliation for purposes of her *prima facie* case. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *Clark v. Jewish Childcare Ass'n*, 96 F. Supp. 3d 237, 263 (S.D.N.Y. 2015). Plaintiff asked to leave early

on two snowy days in early February 2014, and if those are regarded as requests for accommodation, they also suffice in terms of temporal proximity. But the requests included no reference to Plaintiff's condition and there is no evidence that the supervisor to whom they were made understood there to be any connection to that condition. I will assume for the sake of argument, however, that these requests were also protected activity.

Defendants have set forth a legitimate, nondiscriminatory reason for Plaintiff's termination, as discussed above, thereby shifting the burden back to Plaintiff. Thus, "the key [question] is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of [P]laintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of [retaliation]." *Governale v. Cold Spring Harbor Cent. Sch. Dist.*, No. 14-CV-2689, 2017 WL 4357337, at *8 (E.D.N.Y. Sept. 29, 2017) (internal quotation marks omitted).

"There is . . . an unsettled question of law in this Circuit as to whether a plaintiff must show, in order to succeed on her ADA retaliation claim, that the retaliation was a 'but-for' cause of the termination or merely a 'motivating factor.'" *Eisner*, 684 F. App'x at 36; *see Wesley-Dickson*, 586 F. App'x at 745 n.3; *Governale*, 2017 WL 4357337, at *9. The Court will not weigh in on this issue here, however, because Plaintiff's ADA retaliation claim fails even under the more lenient "motivating factor" standard.

Plaintiff's evidence in support of her retaliation claim falls short for substantially the same reasons discussed above with respect to her discrimination claim. That the straw that broke the camel's back was Plaintiff badmouthing Blahut, and that that badmouthing followed Plaintiff's requests to leave early, simply does not suffice to suggest that it was the requests to leave early (or the earlier protest of the schedule change denial), rather than the badmouthing,

that motivated Defendants.  Further, Plaintiff appears only to rely on temporal proximity and conclusory allegations of animus due to her disability.  "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation . . . , but without more, such temporal proximity is insufficient to satisfy [Plaintiff]'s burden to bring forward some evidence of pretext."  *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (emphasis added); *see Clark*, 96 F. Supp. 3d at 263.  Likewise, speculative or conclusory allegations will not suffice to withstand summary judgment.  *Cameron*, 335 F.3d at 63; *Castro v. City of N.Y.*, 24 F. Supp. 3d 250, 261 (E.D.N.Y. 2014).

Thus, Defendants are entitled to summary judgment on Plaintiff's claim for retaliation under the ADA.

### D.    NYSHRL Claims

In addition to her claims under federal law, Plaintiff further alleges that her rights were violated under New York law.  The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that Plaintiff's ADA claims should be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claims.  28 U.S.C. § 1367(c)(3); *see Giordano*, 274 F.3d at 754; *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 256 (E.D.N.Y. 2015) (collecting cases).

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment is GRANTED, (Doc. 56), and Plaintiff's request for oral argument is moot, (Doc. 80).  Plaintiff's claims under

the ADA are dismissed with prejudice, and her claims under the NYSHRL are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 56, 80), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: February 8, 2018
      White Plains, New York

                                      _____
                                        CATHY SEIBEL, U.S.D.J.